# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 22-40054-01-EFM

ADALBERTO SANTOS PEREZ,

*Defendant.*

## MEMORANDUM AND ORDER

Before the Court are several Motions by Defendant Adalberto Santos Perez.  Perez first moves to suppress his statements to law enforcement made while he was in custody following a Drug Enforcement Administration ("DEA") controlled delivery operation.  He alleges those statements were either (1) made prior to law enforcement reading his *Miranda* warnings, or (2) made after the *Miranda* warnings, but were product of deception and coercion such that he did not validly waive his rights.  Relatedly, Perez contends that the purported consent he gave law enforcement to search his cell phone was invalid as a product of the same coercion and deception. These Motions are fully briefed, and the Court held a hearing on the matter on February 7, 2023.

The Court disagrees with each of Perez's contentions.  Because the inevitable discovery doctrine permits the admission of his pre-*Miranda* statement and because there was no deception

or coercion such that Perez's will was overborne or his consent was invalid, the Court denies Perez's Motions (Docs. 32 and 33).

## I.      Factual and Procedural Background

On August 21, 2022, co-Defendant Oscar David Ibarra Tapia was arrested by Dickinson County, Kansas Sheriff's Deputy Andrew Toolin.  Deputy Toolin had conducted a traffic stop of Ibarra Tapia that ultimately yielded three pounds of suspected methamphetamine.   After a brief questioning period with Ibarra Tapia, Deputy Toolin contacted DEA Special Agent Justin Olberding to inform him that Ibarra Tapia was interested in cooperating with the ongoing investigation.

Ibarra Tapia identified Perez as the intended recipient of the three pounds of methamphetamine.  He said that Perez had asked him if he wanted to make $4,000 by driving to Denver, Colorado to pick up three pounds of methamphetamine and transporting it back to Kansas City, Kansas.   Ibarra Tapia had agreed and stated that he was on his way to deliver the methamphetamine to Perez when he was stopped by Deputy Toolin.

 Between August 21 and August 22, Olberding and other law enforcement worked with Ibarra Tapia to set a controlled delivery of sham methamphetamine[1] to Perez.  Law enforcement directed Ibarra Tapia to contact Perez to set the delivery by informing Perez that his car was having trouble.  Law enforcement staged Ibarra Tapia's car in the parking lot of the Hollywood Casino in Wyandotte County, Kansas, and Ibarra Tapia contacted Perez to let him know where the car was

---

[1] Sham methamphetamine is a non-controlled substance designed to imitate the look of real methamphetamine.

located.  Olberding has testified that Perez responded by confirming that he would come, possibly to tow the car.

At around 5:00 P.M on August 22, Perez arrived at the scene in his tow truck. Unbeknownst to him, Olberding and the DEA Special Response Team ("SRT") were in position waiting for him.  As Perez approached the passenger side of the car, SRT swarmed Perez and detained him with zip-tie hand restraints.  A search of Perez's person by SRT officers yielded a cell phone.  Perez was then placed in the passenger seat of Olberding's government vehicle.  After approximately 22 minutes, Olberding approached Perez and asked him the number of the cell phone that was found on his person.  Perez told him the number.  Olberding then read Perez the *Miranda* warnings and immediately began questioning him.

Three audio recordings, Exhibits 1 through 3, offered by the Government contain the content of Olberding's questioning of Perez.  The first audio recording took place while Olberding questioned Perez in Olberding's official government vehicle.  Olberding told Perez, "We got about 15 to 20 pounds of meth on you."  In his testimony at the hearing on these motions, Olberding explained that this statement was based on the amount of methamphetamine his investigation had collected that he believed could be tied back to Perez, not just the three pounds found in Ibarra Tapia's car.  Olberding then informed Perez that if Perez did not want to talk to him, he had permission from the prosecutor to take Perez to jail in Topeka.  Olberding predicted that Perez would appear before a magistrate judge the next day and would be advised that he was facing "10 to life."  "[I]f you wanna help yourself," Olberding advised, "now is the time to do it."

Perez was reluctant to respond to Olberding's questioning in the government vehicle.  He asked Olberding several times, "what do you want me to say?"  Olberding continued to press, informing Perez that Olberding knew his "baby mama" and had bought controlled substances from

her.  He told Perez the phone he had on him was "dirty" and that he had calls and texts between that phone and the phone of the car owner, Ibarra Tapia.  Olberding accused Perez of planning to pick up the three pounds of meth located in the car, which Perez denied.  Perez stated that he was called to tow the car by the owner because it broke down.

Olberding informed Perez that he could "question all the evidence I got.  You're gonna get this all provided to you in discovery.  It's gonna be in a nice, neat little packet that's gonna say DEA on it.  You're gonna be in those cuffs and you're gonna be in an orange jumpsuit with the U.S Marshal transporting you in with your attorney sitting beside you at a table, telling you that you either talk now—." Perez interrupted, again asking Olberding what he wanted from him. Olberding continued by saying he wanted to talk with Perez and find out about his operation.  He told Perez that he had investigated other persons he believed worked with Perez, and that "there is a reason" those persons were not in jail at that time.  Ultimately, Olberding offered to take Perez to a "controlled environment" so they could "talk it out," to which Perez agreed.  Perez was then transported by Olberding to a nearby Kansas Highway Patrol building.

On the way to the KHP building, Olberding reiterated that "[i]f I catch you lying, like I said I've got an AUSA—you don't know what an AUSA is—an Assistant United States Attorney, already on the phone that's told me I can take you to jail, put you in federal custody."  Once at the KHP building, Olberding resumed questioning by telling Perez, "[i]f you can corroborate what you did with them you can help yourself out.  If you don't want to help yourself out, I don't want to waste my time."

Olberding showed Perez multiple pictures of suspected co-conspirators and asked Perez to explain what he had done with them, and how much meth he had sold them. Perez identified several pictures, including Nate Cisneros and Jacob Krainbill.  But Perez pushed back against the

quantities—approximately six pounds—Olberding suggested Perez had sold to these individuals, saying "I don't do that much." Olberding informed Perez that these two individuals were in federal custody, and that they had been caught with large quantities of methamphetamine and fentanyl. He also informed Perez that these individuals and others had identified Perez as their source of supply. Perez admitting to selling four "little ones," which Olberding clarified as ounces of methamphetamine, but disagreed that he sold or even had access to the quantities Olberding was imputing to him. Olberding challenged Perez, saying that the messages on his phone suggested otherwise. Olberding then asked if he could look at the phone, to which Perez replied, "yeah I don't have nothing to hide, bud."

After several moments apparently spent viewing Perez's phone, Olberding again informed Perez that he was facing "ten to life." "If there is nothing you can do to help me," Olberding warned, Perez would be handcuffed once again and taken to jail. Olberding further predicted that Perez would be "locked up at least 10 years. You'll get an attorney. Your attorney will get discovery . . . will look at it, and be like, 'this is the only way you get cooperation on the federal side.' 'It is the only way you get any kind of sentence reduction is cooperation.' That's talking to me, helping me out." Olberding also informed Perez that he could be facing an "importation enhancement," because Olberding believed Perez's drugs came "straight from Mexico." He further warned Perez that the conduct of his alleged co-conspirators could be considered as relevant conduct during his sentencing.

It was at this point in the interview that Perez made several admissions. He admitted that he sold meth to Nate Cisneros twice, the quantity being "about one" —or one pound—each time. He also admitted to dealing to Jacob Krainbill. But Perez continued to deny knowing that there was meth in the car he was picking up when he was swarmed by law enforcement, stating instead

that he was only called to tow it because of mechanical issues.   Olberding, apparently unsatisfied with these admissions, informed Perez that he would be in jail today "if this is all I get."  He told Perez that he did not have to charge him right now or at all.  Perez made no further admissions in the interview.

Near the end of the interview, Perez again consented to Olberding viewing the content of his cell phone, and gave the number to the cell phone again. The interview ended with Perez being transported to a detention facility.

On August 30, 2022, the Grand Jury charged Perez and Ibarra Tapia with a two-count indictment.  Count 1 charged both Defendants with conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine.  Count 2 charged both Defendants with possession with intent to distribute 50 or more grams of methamphetamine.  Ibarra Tapia has pled guilty to a Superseding Information which charged him with interstate travel in aid of specified racketeering activity of conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine.

Perez now moves to suppress his statements made both before and after his *Miranda* warnings were administered.  He also moves to suppress the content of his cell phone, which he purportedly gave law enforcement consent to view, on the ground that his consent was invalidly obtained.

## II.    Discussion

### A.    Statements Made Pre-*Miranda*

Prior to administering *Miranda* warnings, SA Olberding asked Perez the number to the cell phone that was found on his person in a search incident to arrest.  Perez responded with the cell phone number.  He moves to exclude the question and his response as violations of *Miranda*.

Law enforcement are generally required to issue *Miranda* warnings to a suspect prior to the start of a custodial interrogation.[2]  There is no suggestion by the Government that Perez was not in custody at the time, or that this question and answer did not qualify as interrogation.  In fact, the Government assumes for the sake of argument that the question and answer violated *Miranda*. The Government instead relies on the principle of inevitable discovery to secure the admission of Perez's answer.  The inevitable discovery doctrine is an exception to the exclusionary rule, under which "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.' "[3]  The Government bears the burden of proving by a preponderance of evidence that the evidence would have been discovered without the unlawful conduct.[4]

The Government argues the inevitable discovery doctrine applies because law enforcement already had the phone pursuant to a valid search incident to arrest and that probable cause existed such that officers could have obtained a search warrant.  But it neglects to consider that "the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search" without having "taken steps in an attempt to obtain a search warrant."[5]  That probable cause existed for a search warrant does not support the Government's argument based on inevitable discovery.

This does not mean the inevitable discovery doctrine is completely inapplicable.  If the DEA would have ultimately discovered the phone number by some other lawful means, it may still

---

[2] *See Orozco v. Texas*. 394 U.S. 324, 327 (1969) ("The *Miranda* opinion declared that the warnings were required when the person being interrogated was 'in custody at the station or otherwise deprived of his freedom of action in any significant way.' " (citing *Miranda v. Arizona*, 384 U.S. 436, 477 (1966)).

[3] *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

[4] *Id.*

[5] *United States v. Souza,* 223 F.3d 1197, 1203 (10th Cir. 2000).

be admitted under the doctrine.  Olberding testified that, had Perez not told him the phone number, he would have simply called the phone number he suspected, based on his previous investigation, was attached to the phone.  Olberding informed the Court that he has done this in multiple other investigations.  He would not have needed a warrant to simply call the suspected phone number and see if the phone found on Perez's person rings.  As noted by the Government, the phone was in the DEA's possession at this time.  Olberding's testimony conclusively establishes that he would have inevitably learned the phone's number by simply calling the number he suspected, which he had learned because it was the number Ibarra Tapia was communicating with between August 21 and August 22.  Thus, the inevitable discovery doctrine applies to permit the admission of the Perez's statement as to the phone number.

An additional avenue for admission of Perez's statement as to the phone number is the doctrine of *Oregon v. Elstad*.[6]  In *Elstad*, the Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."[7]  "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement," the Court reasoned, a "subsequent administration of *Miranda* warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[8]  Here, Perez responded to an unwarned question from Olberding.  But there is no indication that the initial questioning was coercive, nor that Olberding was employing deliberately improper tactics in obtaining this first unwarned statement.

---

[6] 470 U.S. 298 (1985).

[7] *Id.* at 318.

[8] *Id.* at 314.

Perez's later, warned admission of the cell phone number should then suffice to allow the admission of Perez's statement as to the phone number.[9]

Under either doctrine, the result is the same. Perez's pre-warning statement as to the cell phone number of the phone found on his person is admissible.

**B.      Statements Made Post-*Miranda***

Perez begins by admitting that he never unequivocally invoked his *Miranda* rights during Olberding's interrogation. He relies, however, on the rule that "[e]ven absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement."[10] Such waiver can be implied.[11]

The waiver inquiry is two-fold— "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' "[12] Perez contends he did not waive his *Miranda* rights voluntarily or with awareness of the right being abandoned.

---

[9] The Court notes that this conclusion is based on its conclusion below that Olberding's post-*Miranda* questioning was not coercive, deceptive, or otherwise improper.

[10] *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

[11] *Id.* at 382-83 ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

[12] *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Perez believes his case closely resembles *United States v. Young*.[13]  In *Young*, the Tenth Circuit relied on several factors to find that the defendant's post-*Miranda* confession was not a product of a valid waiver of his rights.[14]  The agent in that case misrepresented the potential penalties the defendant faced.[15]  He also misrepresented his own ability to ensure leniency for the defendant, telling the defendant that each truthful answer could "physically buy down" the length of his sentence, which the agent represented he could assure based on his conversation with a federal judge.[16]  The Tenth Circuit found these misrepresentations "particularly troubling," and ultimately concluded that the agent's conduct was coercive in nature.[17]

Olberding's interrogation tactics are markedly different from those of the officer in *Young*.  Unlike the agent in *Young*, Olberding did not misrepresent the penalties Perez faced.  The Grand Jury charged Perez with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846, and possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).  Though Perez takes issue with Olberding's repeated statements that Perez faced "10 to life," this is an accurate statement of the penalty prescribed by statute if Perez was convicted of those crimes.[18]  So no misrepresentation plagued Olberding's description of the penalty Perez faced.

---

[13] 964 F.3d 938 (10th Cir. 2020).

[14] *Id.* at 946.

[15] *Id.* at 944.

[16] *Id.*

[17] *Id.* at 945.

[18] *See* 21 U.S.C. § 841(b)(1)(A) ("In the case of a violation of subsection (a) of this section involving—(viii) 50 grams or more of methamphetamine . . . such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life . . . .").

Olberding did not make a misrepresentation as to the strength of the evidence against Perez. Early in the interrogation, Olberding informed Perez that he "had about 15 to 20 pounds of meth" on him. Perez understands this statement to mean "on his person," which would be untrue because the amount of sham meth in the car was only approximately three pounds. But Olberding's testimony clarifies that this statement was meant to inform Perez of the amount of methamphetamine that DEA agents had recovered at that time that they believed could be tied back to Perez. There is no evidence Olberding was being untruthful with this statement.

Nor did Olberding make any misrepresentation as to the potential for leniency. Olberding represented to Perez that he had spoken with a prosecutor who informed him he could take it "as far as [he] want[ed] to go." He later explained that he had permission to take Perez to jail that day if he didn't give Olberding anything actionable. Olberding also suggested the opposite was true— if Perez gave him something actionable, he could be released that day and not charged. Perez takes issue with Olberding's statements to this effect, comparing them to the agent's statements in *Young* that he had spoken with a federal judge and that "every time you answer a question truthfully, it ticks time off that record, . . . that's the way it works."[19] But while it was clear in *Young* that the agent was lying—no federal judge informed him that he could "tick time off" for every question answered truthfully by a defendant—it appears that Olberding was being truthful with Perez. He had been in contact with his prosecutor, who had given Olberding discretion in deciding how he wanted to handle Perez. If Perez provided something "actionable," it appears Olberding was being truthful in telling Perez he did not have to charge him and that he could keep him as a confidential source. Olberding testified that did not tell Perez he would have to confirm

---

[19] *Young*, 964 F.3d at 944.

-11-

his decision with the prosecutor at the end of Perez's interview, but the Court does not find that this omission makes his statements misleading. Olberding's statements to Perez were truthful. Because the court in *Young* relied heavily on the agent's gross misrepresentations to find that the defendant's confession was coerced, *Young* is inapposite here as Olberding was truthful with the Perez about both the legal consequences he faced and his discretion as to whether to bring Perez to jail or keep him protected as a confidential informant.

Olberding's statements were still, however, a promise of leniency. Tenth Circuit caselaw appears to look askance at *any* promise of leniency (beyond limited statements that the prosecution will be informed of the defendant's cooperation).[20] But a promise of leniency does not automatically mean a confession was involuntary.[21] Rather, it is relevant to that inquiry and, "depending on the totality of the circumstances, *may* render a confession coerced."[22] In considering the totality of the circumstances, courts weigh: "[1] the suspect's age, intelligence, and education; [2] whether the suspect was informed of his or her rights; [3] the length and nature of the suspect's detention and interrogation; and [4] the use or threat of physical force against the suspect."[23] None of these factors suggest coercion here, as Perez at the time was a 33-year-old, U.S. Citizen with a GED with no history of mental health or substance abuse treatment, was properly informed of his rights, was only detained for approximately 22 minutes before his interrogation, which lasted less than an hour, and there were no threats of physical force.

---

[20] *Id.* (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997), *overruled on other grounds by Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007).

[21] *See Clanton*, 129 F.3d at 1159.

[22] *Id.* (emphasis added).

[23] *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010).

Perez contends he was not properly informed of his rights, as Olberding read his *Miranda* rights and then launched into questioning immediately without asking whether or not Perez understood his rights. Perez cites to no caselaw suggesting that an officer is required to ask a suspect whether they understand their rights. In fact, a suspect's acknowledgement that he understands his rights is only one of several factors courts have considered in determining whether the suspect understood the *Miranda* warnings.[24] The others are whether the suspect "expressed an inability to understand the discussion, and whether he answered in a manner that was appropriate and responsive."[25] While Perez never acknowledged that he understood his rights, he never expressed an inability to understand the discussion with Olberding and always responded to questions in a manner that was appropriate and responsive. Accordingly, the Court finds Perez was properly informed of his rights.

Considering the totality of the circumstances, Olberding's truthful representations regarding the potential for leniency were not coercive such that Perez's will was overborne. Olberding's questioning was certainly firm, direct, and persistent, but remained professional throughout. He told Perez the truth regarding his discretion over Perez's situation as well as the legal consequences Perez faced. While the Court does not doubt that this was an uncomfortable situation for Perez, the totality of the circumstances indicate that he understood his rights and voluntarily chose to waive them when he confessed to selling pound quantities of methamphetamine. Perez's Motion to Suppress his statements to Olberding is therefore denied.

## C.      Consent to Search Cell Phone

---

[24] *United States v. Ortega*, 2016 WL 4702421, at *5 (D. Kan. 2016) (citing *Matthews v. Bonner*, 605 F. App'x 741, 742–43 (10th Cir. 2015)).

[25] *Id.*

While Perez was interrogated at the Kansas Highway Patrol building, he twice gave his consent for Olberding to look at the contents of his cell phone.  He informed Olberding "I ain't got nothing to hide, bud."  Perez now asks the Court to suppress the content of law enforcement's search of his phone, as he believes his consent was a product of the same coercive and deceptive tactics complained about above.  Because the Court has concluded no coercive or deceptive law enforcement tactics plagued the interrogation, it likewise concludes Perez's consent was validly obtained.  His Motion to Suppress evidence obtained as a result of the search of his cell phone is denied.

**IT IS THEREFORE ORDERED** that Defendant Perez's Motion to Suppress Defendant's Statements (Doc. 32) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Perez's Motion to Suppress Illegally Seized Evidence (Doc. 33) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 14th day of February, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE